Counsel, you may state your appearance Good morning, Your Honor. James J. Leavitt on behalf of the Appellant Landowners. May it please the Court, I have the privilege of representing the Sheehan family in this matter, and I'd like to reserve, with the Court's permission, three minutes for my reply argument. Members of the Court, this case presents important questions respecting the standards for valuing a one-of-a-kind property taken by eminent domain. My argument today will focus on three areas of error that are grounds individually and cumulatively for reversing the Commission's order in this case. The first will address the improper application of the Project Influence Rule. My second argument will address three critical errors that the District Court made when it excluded evidence which was necessary to show the demand and pricing to determine the financial feasibility element of highest and best use. Those two critical pieces of evidence were the F.O.R.E. surveys and the Gross Rent Income Capitalization Methodology, which I will refer to as the G.R.I.C. methodology during my argument. And then the third legal error I will address is I will reference again the G.R.I.C. methodology, which when the Court excluded that methodology, it made it impossible to arrive at just compensation in this case. On the first error related to the Project Influence Rule, that error is seen most clearly in the Commission's finding number 123, which was affirmed by the District Court. In finding number 123, the Commission held that as of the relevant date of value in this case, the Air Force could file an objection with the Lincoln County Board of County Commissioners to prevent the landowners from using their property to its highest and best use. And here's the most offending language of that finding. Even if the zoning was available and provided that highest and best use was legally permissible. In other words, what the Commission did is it valued the landowner's property as if the Air Force could have stopped landowners from using their property to its highest and best use, even if the landowners had the legal right to use their property to that highest and best use based upon the then existing zoning. The reason finding number 123 is legal error is because it violates, as I stated, this Court's rule on the Project Influence Rule. In U.S. v. Weyerhaeuser, this Court was not unclear. It held that any project that the government has for taking property in an eminent domain case must be, quote, totally excluded, end quote, when valuing the taken property. Or stated another way, the property must be valued first as if the government was not condemning the land. And secondly, as if the government had never and would never do the project. Now the parties entered into two stipulated facts in this case, number 16 and number 12, to make sure that the project was totally excluded. And stipulated fact number 12 describes exactly how the property should have been valued in this case. Stipulated fact number 16 states the project very clearly. The project is the singular acquisition of one property to keep people off of that property. Never at any time did the government represent to the court or otherwise in pleading or testimony that the government ever intended to physically use the property. Meaning that the sole project was the acquisition of this landowner's property to keep people off of that property. Therefore, in this case, what the court should have done is the court should have held that the government's power to condemn the property and the government's desire to keep people off of the property should have been totally excluded when valuing the landowner's property. And that's why the parties entered into stipulated fact number 12. Stipulated fact number 12 states three things very clearly. Number one, it starts out stating for valuation purposes in this case that the landowners for themselves, their business visitors, and their employees would be granted access. The second part of stipulated fact number two states that the government could not stop the landowners, their business visitors, and their employees from accessing the property. Nor could they limit the number of people that come onto the property. And the third part of that stipulated fact was that the Air Force could not constrain or interfere with the access to the property. Instead of excluding the project and valuing the property as provided under stipulated fact number 12, as I stated, the court in finding number 123 expressly stated that the Air Force could object and could preclude the landowner from bringing people onto the property. The decision on zoning, whether to permit or not to permit something, does not lie with the federal government, it lies with the local government, correct? That's correct, your honor. So, an objection might or might not be sustained, so I don't understand why that is problematic. Well, because finding number 123 does not only say that the Air Force could object, it goes on to say that they could object and then prevent the landowners from using their property to its highest and best use, even if zoning permitted that use as a matter of right. An objection to prevent, an objection, I read that as simply saying they would have the opportunity to intervene, not that they could make a decision. Contextually, that doesn't track, I think, what 123 actually means. I understand that, and that's not just, I use that as the best example, it permeates the entire order. But, it's a good question, because there would have been no avenue for the government to even object. And so, when the court found that the landowner's proposed highest and best use to bring people onto the property in charge of fee was not legally permissible, it should have, instead of making that finding, it should have deferred to the local agency, like you just stated, and the local agency... That is likely to have happened, and it seems to me that in the absence, you still have the burden to show that in the absence of the eminent domain, this was a plausible, or more than plausible, reasonable expectation. And, I think that those other issues seem to me to be distracting from that main question. With that, your honor, I will, one final statement on the legal permissibility is that the local agency did confirm that under the A5 zoning, the landowners did have the legal right to enter onto the property and use it for bringing people on and charging a fee. But, your question is on point, your honor, and that is whether the use itself was speculative or not. And, you're right, that permeates the court's entire order. Perhaps the best location where this is stated in the commission's findings is findings number 93 to 95, and footnote number 7, where the... I'm concerned about your argument. It seems to me that it is a highly speculative use, and if that is true, then it's completely unrealistic to think that this would be a lucrative recreational site, given the evidence in its totality, and doesn't that really answer everything about the case? Yes, and I understand the question. The concern that we have in that regard is that the district court, in the first instance, excluded two critical pieces of evidence that would have met the standard that the commission requested. The commission stated that the evidence that it wanted to see was demand and pricing for alien-themed tourism, Area 51, and a visit to the Groom Mine. The commission said without that evidence, the use is speculative. The four surveys that the landowners commissioned in this case specifically gauged the demand and pricing for alien-themed tourism, the desire to see Area 51, and to go onto a property that has a view of Area 51. Those four surveys also asked the question, how much money would you be willing to pay to go onto a property that has a sole and exclusive view of Area 51? So when the court excluded those four surveys in the first instance, it prevented the landowners from presenting to the commission that very evidence which would have overcome that speculation. That was the most critical evidence here. It was evidence that the survey expert was going to testify to. The landowner's three valuation experts relied upon that survey evidence. That survey evidence had three questions that it presented to the respondents. Number one, are you interested in Area 51? Number two, would you like to go on a property that can see Area 51? And number three, if so, how much would you pay to go onto a property where you could see Area 51? And 50% of the respondents that met the qualifying question stated... Hello? I'm not sure whether you can hear me if I'm talking when you're talking, so I don't mean it all to be impolite. But we've had some audio issues. My concern is I don't see in the surveys that you proposed that it informed those surveyed that they would have to ride on a bus for hours and hours to get to this site. Or that they can see Area 51, but not from anywhere up close. It's several miles away. So, isn't that pretty unreliable? Experts, as I understand it, designated to describe the appropriateness and reliability of those surveys. I'll answer that in two parts. First, in the initial order that the court entered in this case, the court went through a 15-page detailed analysis outlining the reliability of the surveys. Secondly, this court has a line of six cases where it has held that it's an abuse of discretion to exclude surveys. And most recently, in December 2021, in quoting that case, this court says that technical inadequacies in a survey, including the format of the questions, or the manner in which it was taken, bear on the weight of the evidence, not its admissibility. That's exactly what I'm saying. If they're unreliable, maybe it's a matter that's properly called harmless error, but if the surveys are unreliable, then exclusion wouldn't matter to the outcome. And I guess that's my ultimate question to you. Well, we never had the opportunity to present that evidence, and this court has repeatedly held that a party who brings a survey in the Ninth Circuit should have an opportunity to lay that foundation and present that evidence to the finder of fact. And we never had the opportunity to present that evidence to the finder of fact, which was the expressed and specific evidence that the commission asked for. And I'll just reference one last thing on the gross rent income capitalization methodology. That is a detailed analysis of demand and pricing. It's a micro-analysis, which again would have assisted the trier of fact in this case with determining whether a tourist commercial use was viable. And I'll close with one last argument. I see my time's running out. I want to reserve a couple minutes. When the court excluded the gross rent income capitalization methodology, it then held that the landowners had to value their property under the comparable sales approach. The court had already held that there were no real-world comparators, and the commission after the fact held that there were no real-world comparators, which made it impossible to value this property. You cannot value a one-of-a-kind property for which there are no comparable sales under the comparable sales approach. And for those three reasons, Your Honor, we ask that the court reverse, and I'll save my remaining time for reply. Thank you very much. Counsel, please state your appearance. Good morning, Your Honors. May it please the court, Eugene Hanson on behalf of the United States. Your Honors, the Sheehan landowners had the burden of proof in this case. The trial judge and the three land commissioners found that they did not carry that burden after an eight-day trial, a site visit, and the presentation of 12 different witnesses. In particular, the Sheehans failed to prove the reasonable probability of a large-scale tourism operation involving bringing 91,000 tourists inside an active military testing and training range and charging those tourists $400 each to look at buildings from a distance of six to seven miles. Buildings that can be seen for free on Google Earth. The trial court and land commission reached that determination after applying agreed-upon legal instructions proposed jointly by the United States and the Sheehans. And on appeal, the question is whether the trial court and three land commissioners clearly erred. There was no error here, let alone a clear one. And let me start with the legal permissibility point that Mr. Levitt started with. The commissioners in the court found that the existing agricultural A5 zoning designation in Lincoln County did not permit a large-scale commercial tourism use like that proposed by the Sheehans in this case. They then went on to find that such a use could be permitted if Lincoln County issued the special use permit. And then the court and commission made specific findings that it was not reasonably probable that that permit would issue. So the question for this court is whether any of those findings are clearly erroneous. And they're not because they're supported by the record. Mr. Levitt suggested to you that there's a scope of the project or project influence issue in this case. There's not. What the commission did was apply an agreed-upon legal instruction that was jointly proposed by all parties. And that was instruction number 11. And this is volume 5 of the excerpts of record at page 1044 to 1045. And that legal instruction provided that the date of the project in this case is December 2014. And so anything after December 2014 should not be considered. However, the instruction explicitly states that the positive and negative effects of the Nevada Test and Training Range, or NTTR, that existed prior to December 2014 had to be considered. And it also went on to say that the positive and negative effects of the 1984 land withdrawal had to be considered. So this is critically important. And it's very important that this court understands the context. In 1984, the Air Force requested that Congress withdraw all of the land surrounding the Groom Mine because of the classified military testing and training missions that are performed in the vicinity. And we refer to this in our brief, the legislative history. There's reams of it. And it makes crystal clear that that land had to be withdrawn from public use because of safety and national security concerns. And then Representative Harry Reid said at the time, this is where the most sensitive work this government is doing is done, so you cannot have people coming out there. So based on legal instruction number 11, that was something that the commission had to consider, the negative effects of the 1984 land withdrawal. So it's clear, beyond any doubt, we would submit, that the Air Force had an objection to tourism. Indeed, it would have been malpractice not to object to tourism. Because as the evidence of trial established, those missions cannot be performed when people from the public are present at the Groom Mine. So the court and commission's ruling did not violate the scope of the project rule. It followed the joint legal instruction. With respect to the survey evidence, the court determined that that survey evidence should be excluded because the students failed to put forward a witness who could testify to the reliability of those survey questions and that individual's qualifications for so testifying. They didn't put forward that witness in their opening brief. They didn't put forward that witness in their reply brief. Mr. Leather didn't reference that witness because there is no such witness. And under the cases we cite in our brief, including Elliot v. Google, a proponent of surveys needs to put forward a sponsor who can testify to the substantive reliability of those surveys. This is a very big issue in this case, as Judge Graber alluded to, because these are incredibly misleading surveys. They don't describe the good being provided as one example. So the good being provided is a view of Air Force buildings from a distance of six to seven miles away. That's not described in these surveys. They're misleading. The survey states that you would be one of a limited number of persons to view Area 51. But in fact, you would not be one of a limited number of persons to view Area 51. You'd be one of hundreds daily and more than 90,000 persons a year. The survey says you would be on the property for a full day, but in fact, the chance witness testified at trial, you'd be on the property for an hour. So it was critically important in this case that they have some witness who could actually sponsor these surveys and testify to their substantive reliability. One final point on that is the surveys employ an iterative bidding process where they actually propose, as the first number, a $1,000 entrance fee. And the United States Court of War Unrebutted expert witness reports that that is unreliable and that's not how such surveys should be conducted because it results in starting point bias. Finally, with respect to the income approach, the court did not abuse its discretion in excluding the income capitalization approach in this case. Basically, to do the income capitalization approach in this case, you have to create from whole cloth a balance sheet of a hypothetical tourism business. So the Shands put forward three experts who made assumptions. If we were to conclude that the proposed use that is being described by the Shands is too speculative, would we even need to reach this issue? In other words, if we don't think that it's plausible that there would be, or that the district court did not clearly err in concluding that it's not plausible that there would be this business, then we'd have to reach this issue. No, Your Honor, that's correct. You would not need to reach the income capitalization issue, nor would the court need to reach the survey issue. Let me just touch on the survey point quickly. The court found that it was speculative for several reasons, including that the Shands themselves had never made any use of the property for tourism. They had taken no steps to further tourism use, and no one else had expressed any interest in tourism. And the Shands' own expert witness, their rebuttal appraiser, testified that tourism was speculative. So that finding has nothing to do with the survey evidence. So just based on that evidence alone, those findings were not clearly erroneous, and you could affirm the judgment. You could also affirm the judgment based on the factual finding that tourism was not a legally permissible use. And again, the surveys do not relate to that finding. In their reply brief, the Shands suggested that perhaps that survey evidence could have impacted the finding legal permissibility. I think that's not a correct reading of the commission's decision in this case. And in particular, the trial court noted that the commission recognized the reality of the NTTR in its legal permissibility finding. And the reality of the NTTR is that any tourism use would be wholly incompatible with an active military testing and training range. And finally, with respect to the income capitalization approach, if the court were to find that tourism is speculative, then that would mean that values predicated on that speculative use are irrelevant. So you don't need to reach the income capitalization issues. Just quickly, to the extent the court were to address the income capitalization issues, there were myriad speculative inputs that each of their three appraisers had to make, including the entrance fee, the number of visitors, the expenditures of each visitor on sailing and trinkets, the percentage of revenue as rents, the cap rate, whether there would be improvements. And at the end of the day, your honors, what they were doing is valuing a speculative business that had never existed. A business that would depend on marketing strategies, on the ability to recruit and retain talents, that would depend on good reviews. If a family of five paid $2,000 and all they saw were buildings from a distance of six to seven miles, there might be some pretty adverse reviews that would destroy that business. So for all these reasons, the court did not abuse its discretion in excluding the income capitalization. If I could just ask you a question. I know you don't think that we necessarily need to get to the project influence rule, but just to ask, why did the government ultimately decide to take this groomed mine property? It seems like the Sheehan family owned it for years and it didn't interfere with government operations previously. Yes. So the evidence of the record is that the Sheehans, around the time of the 1984 land withdrawal, visited the property about four times a year for a few days in length. And then the Air Force was able to work around these occasional visits. So the party stipulated that by, I think, around the 2014-2015 timeframe, around the time of the take, they were coming as many as seven, eight, nine, ten times a year. And the Air Force, at some point, just couldn't work around those occasional visits. The evidence that when there were civilians on that location, the testing could not take place. Am I correct in calling that? Yes, that's correct, Your Honor. Thank you. Do you have anything else? No, unless the court has further questions, we'll rest on our brief and respectfully ask that the court form a judgment below. Thank you very much. Mr. Leavitt? Yes, Your Honor. Thank you. Again, James D. Leavitt on behalf of the appellant landowners. In regards to the surveys, the commission actually referenced in its findings two high-level surveys. A survey by National Geographic and the Las Vegas Convention and Visitors Authority survey. And the commission held that those were at the 50,000-foot level, and that they wanted surveys which were more detailed and specific that gauged demand and pricing for alien-themed tourism, for Area 51, to come onto the landowner's property. And that's what these specific surveys gauged. And so it can't be said that this was harmless error when the commission itself relied upon surveys that were at a high level, and then stated that they wanted evidence on a more specific level, and these surveys met that exact demand and pricing request that the commission was requesting. And this court has held repeatedly that even a bad survey deserves its day in court. In Wendt v. Host International Inc., a 1997 case by this court, the lower district court found that it was, quote, not a good survey. And this court held that was not grounds to exclude the survey. Every survey deserves its day in court, and the arguments that Mr. Hansen just made are great cross-examination, but they're not grounds to exclude the surveys. These surveys were critical pieces of evidence, which is why the government sought to exclude them. And we respectfully request that you reverse, allow the finder of fact to consider this survey evidence. It clearly would have made a difference. Thank you. I see I'm out of time unless you have another question for me. I don't think so. Thank you so much. Thank you both for your oral arguments here today. The United States of America v. Jesse James Cox is now submitted. Thank you.
judges: MURGUIA, GRABER, Fitzwater